Welcome to Council. We appreciate Council traveling so far from Missoula and from Washington, D.C. to meet us. And we have Mr. Huppert for the appellant. Actually, Your Honor, Mr. Huppert is here. Okay, Mr. Byron. Yes, thank you. And you're representing the government appellant? That's correct. May it please the Court, I am Thomas Byron from the Department of Justice. I'm here on behalf of the Appellants and Prosecutors, the United States and the Forest Service. I'd like to begin by reminding the Court that we offered in our brief, and I'll discuss today, three independent legal reasons why the district court's decision should be reversed. And I'll just go over them quickly before I get into the details. First, the Federal Proclaims Act discretionary function exception protects the government's efforts here to identify the trail hazards. That's what the issue is there, and I'll get into that in a little more detail in a moment. Second, Montana state law establishes a different standard of care than ordinary negligence. And the district court improperly disregarded the two statutes that establish that standard of care. And finally, any negligence by the government, even if you get past those legal barriers, any negligence by the government cannot be deemed to have been a cause of the plaintiff's injuries here, which were caused when he walked into the path of two of his drunk, speeding friends at night and was struck by them. The government is not to blame for those injuries. As I said, these are all three. The causation issue, he walked into the path because of the situation he was in, which he claimed, and I guess the judge found, was in part caused by the signage or lack of signage. Actually, I don't think that's right, Judge Gould, and here's why. The district court did not find that the lack of a sign caused him to walk into the path. Or would that make any sense? There was never any claim. No one knows exactly why he did it, right? That's right. He couldn't testify, here's why I did it. Exactly right. But the point is that the presence of a sign wouldn't have stopped the triggering incident here. It wouldn't have prevented him from walking into the path. They weren't asking for a sign that said, don't walk into the path of drunk, speeding snowmobilers. But it would have prevented the crash that led him to walk into the path. It's the snowmobile speeding over the hill and then going out of control and turning over. I don't think so, Judge Horsford. And the reason is that the snowmobiles that were speeding and that struck him, Calhoun and Weinberger, were both intoxicated, impaired in their judgment, and far exceeding the speed limit, 55 to 60 miles per hour. With regard to that, is there A, evidence, and B, a finding by the district court, with regard to any evidence as to whether the individuals who were ultimately held liable, not Johnson but the other two, would have done anything different if there had been a different speed limit or a hazard sign? Let me address each separately because, first of all, there is no finding that they would have done anything differently. And that's the key point that we emphasized in our opening brief. The evidence is only self-serving testimony by the individuals themselves. Well, but that's evidence, especially in this instance, in which it isn't so self-serving because they're not the victim. Well, it is self-serving in their effort to shift the blame. When the district court found that they themselves actually were negligent, that they breached a duty, and that that breach of duty is what caused the injuries, their efforts then to shift the blame by saying, despite being drunk and speeding, and, in fact, they didn't say despite being drunk and speeding, that's essentially the problem, that they said that they would have taken account of the signs. But did each of them say that? I believe... Weinberger and one of the other guys. I believe Weinberger did. Kalahar. I don't remember if Kalahar separately did, but I think... I have to check, Your Honor, and I apologize, I don't recall. In that argument, the idea that what they're saying is self-serving to shift the blame, it seems like it goes to the weight of what they said, but that there is evidence in the record, at least, before the judge, that something different would have happened. Fair enough, Judge Gould, but after all, there's no holding. The district court did not specifically hold that they would have done anything different, that those two individuals, the ones whose judgment was impaired and who were exceeding the speed limit, that they would have done anything different if there had been a warning sign. It didn't make a specific finding of fact on them. That's correct, Judge Gould. Right, and that's the failure that I think drives the legal conclusion that we see here. We're not asking for a clearly erroneous finding, after all, which would depend on whether there was evidence and what that evidence said. We're saying the district court never addressed the essential question. That doesn't take it very far, really, because we would remand and he would make a finding in front of a jury trial, and then we'd be back where we are, probably. Well, but that is key because that evidence is not by itself sufficient. As we say, it does have credibility problems. It doesn't address the key questions of whether their impairment, this would require the finder of fact to assess this, whether the impairment would have affected their ability or their willingness to change their behavior. Those are the questions that we think are unanswered on this record, and therefore it's not futile. Is it your position that the government can't be liable for failure to warn in the absence of proof that the failure to warn would have been observed by a person? Is that what you're saying? No, Judge Forster, I don't think so. I think the question under Montana law is whether it was foreseeable that an individual could be injured by walking into the paths of drunk-speeding snowmobilers, and that's the intervening cause question. Is that what you're getting at? No. You said there's no evidence that they would have changed their behavior if they had been on the sign. I don't see how that has a bearing on the government finding of negligence. If there is a dangerous condition and the government fails to warn, then they're liable for the consequences that have approximately developed without regard to whether it's actually shown that the public would have behaved differently. I disagree. This goes to causation, where there's an intervening cause, as there was here. In other words, this isn't an injury that happened because Musselman himself was unable to negotiate the hill. In other words, the danger of the hill itself, the asserted danger of the hill itself, didn't cause Musselman to do anything that hurt him. Instead, there were intervening causes, him walking into the path, his friends speeding, and having their judgment impaired. Now, those intervening causes, then the question becomes whether the government can still be liable, and that's why I emphasize the question under Montana law. Is it foreseeable that this course of events would occur, and therefore, is it proper to hold the government liable? Well, isn't it foreseeable that snowmobiles would speed over the hill if they hadn't been warned of the dangerous condition? The district court said so, and we haven't challenged that aspect of it. Well, that's a finding that we have. That's right. Now, if it's foreseeable that they speed over this dangerous place in the absence of warning, it's foreseeable that somebody would get hurt as a result. Now, is it necessary to foresee the precise manner in which the injury occurs? When there are intervening causes, I believe it is. What's the intervening cause? Here, the intervening cause is that the individual walked into the path, and the other intervening cause is that the injury was caused not by his own actions with respect to the asserted danger, but instead another's actions, and those others' actions are influenced by their own conduct. If I may, I do want to shift to what we think are equally, at least, important and reasons warranting reversal. I also want to try to save a few minutes, if I can, to respond to the prosecution and offer rebuttal. First on discretionary function, the issue here on the discretionary function analysis is whether the government's effort through the warranting process in 1993 and also through the decision in 1996 on which the district court rested liability, the decisions whether and how to conduct the warranting process were discretionary and were grounded in policy-based considerations. The district court... Policy has to be not just policy. It has to be social, political, or economic policy, right? Yes. How are these social, political, or economic policies? Suppose the government decided, I gather it decided to do the warranting at 35 miles an hour instead of 45 miles an hour. Why is that a social, economic, or political policy? First of all, the decision about what's the design speed like the decision about what speed limits are set, and I think your question encompasses both issues, include the consideration that's reflected in the testimony of Kemp, and I think Apple Kemp as well, that the trail was designed for users of varying ability. The Forest Service wanted to ensure that it was available for the recreational use, not just by experts like Musselman and his friends, but also for beginners and families who sought to use these public lands. So that, after all, is one of the social factors that influenced the government's decisions. Now, it does seem to me that your question gets at was safety the only factor, and I don't think it was. After all, there are lots of... You can always make something safer, but the decisions that the government made here about... But ultimately, the decision here was to put up a sign saying 45 miles an hour instead of 35 miles an hour, when the safety was only, in fact, really validated at 35 miles an hour, and to not put up another sign saying Kemp. Those were the two decisions, essentially. Let me back up for just a minute, because I don't think that accurately reflects what the discretionary function analysis asks in this case. Here, the issue is whether the government properly set out to identify the hazards. In other words, this isn't a case where there was a known hazard, as in, for example, Sutton or Summers, and the court said, well, if the government knew about this and just didn't do anything about it. This question about discretionary function in this case is different. This is a question whether the government properly undertook to identify the hazards that warranted particular signs. And that's why the warranting process has always been the heart. You're referring to the Panzer accident. Let me address the Panzer accident separately, and I want to emphasize, too, that it is separate from the warranting process. It does seem to me that the district court said the government should have known because of the Panzer accident as well. So, let's say for a moment, the warranting process is protected by discretionary function. After all, the district judge recognized that it was, for example, doing it only in a day time, doing it at 35. Those were discretionary decisions the judge correctly held. Now, the question then becomes, what does the Panzer accident add to the discretionary function analysis? The district court never addressed it in those terms, and it should have. The district court instead said it was negligent for the government not to warrant within two weeks after that accident occurred. Now, of course, negligence has nothing to do with the discretionary function analysis. And there's nothing in the record or in common sense that would suggest that the government had either a mandatory duty or a duty under Step 2 of Berkowitz that says you must always post a sign immediately or within two weeks after an accident occurs. Now, that's not reasonable, after all. Accidents occur all over the place. An assessment of what caused the accident, whether that cause suggests further implications, is going to take more than two weeks. It's not identical, after all. Remember, one of the great concerns... But this analysis, at any rate, has nothing to do with the discretionary function analysis that you just said. It seems to me it's run-of-the-mill. This is run-of-the-mill Montana negligence law. That's right. But you can't get to it unless you first address the... Why don't you just say whatever may be true of the warning process, anybody who otherwise had signs around showing hazards and who knew about this accident would be negligent if they didn't put up a sign. Now, that may be true or may not be true, but it's not a discretionary function question. I agree it's not a discretionary function question, but you can't get to ordinary negligence questions until you first address whether it was a discretionary function. And here, you have to address it in discretionary function terms, in Berkowitz terms, under Step 1. There's no mandatory duty to put up a sign immediately or within two years. But there may be negligence under Montana law to have a lot of signs that you've already put up to know about an accident at another place where you don't have a sign and not to put up a sign. Why couldn't that be Montana negligence having nothing to do with the discretionary function? I think that's precisely what the district court held, and that's the error. Because before you get to negligence, remember, the discretionary function exception to the statute says whether or not the discretion is abused. And that says whether or not it was negligent to do it, in this case, whether or not it was negligent to fail to post a sign. It doesn't matter if the failure to post that sign was a consequence of the discretionary decision. But it wasn't in this instance, as I understand it. Why was it? What connection is there between the failure to post the sign? Well, as we said, there was never any identification of this as a hazard, neither on the warranting process nor in the follow-up to the Panzer accident in that two-week period. It's not reasonable to impose on the government a two-week window or less. But that's a negligence argument. It's not a discretionary function. I think that's right. But it goes to discretionary function in the following way. If you believe that the government should have been put on notice and that therefore the discretionary function analysis requires an assessment of whether the government's failure to identify this as a hazard in light of the Panzer accident was a discretionary one, was there a mandatory duty? The answer is no. Was it grounded in policy considerations, whether they were going to put up a sign immediately after an accident? I think it was. Because after all, the more signs you have, the more likely it is that they're going to be ignored. There's evidence in the record, and it follows common sense, that just as in a highway situation, you're not going to post a plethora of signs. Are you going to address this statutory instrument switch in some way for the most interest of you? Yes, I'd like to very much, and let me move on. To set your mind to the complicated case, there's a lot of issues. Certainly. And across the field. Although it was set for 20 minutes per side, I'll add another five minutes. I appreciate that. And to your colleague, Mr. Hufford's time. I appreciate that, Jim. I don't want you guys to come here from D.C. and from Montana and not have a chance to speak for your clients. I appreciate that. Before you leave the subject, though, could you tell me what your best authority is for the proposition that the failure to post a sign in a known risky situation is a discretionary function? Judge Schwartz, we don't make that argument. And remember, the argument that I've tried to emphasize today and in our briefs. What's the best case that you have to support your position? This case, like Childers and Valdez and Blackburn, is a case in which the government had to make a judgment about which unknown hazards to warn about, not which known hazards. And that's precisely the difference that we think distinguishes this from cases like Faber and Summers and Putnam, in which there was a known hazard. Let me turn to the state law question, because the Montana legislature adopted two statutes that established a different standard of care in tort cases such as this one. And ordinary negligence, they said, should not apply. First, they said in the Snowmobile statute that gross negligence was the proper measure. That's the 96 statute you're talking about. 96? No, 87. I'm sorry? 97? 87. Oh, 87. In effect in 96. It was in effect in 1996. That's correct. The gross negligence standard had been adopted by the Montana state legislature. Now, the district court here first said it believed that that statute was unconstitutional under Montana state law, under the Equal Protection Clause of Montana Constitution. Now, one thing I've been wondering is, do you know whether Montana takes certified questions and would it make any sense for us to certify that question to Montana Supreme Court? I believe that the Montana Supreme Court does have a certification procedure, and we have not previously addressed whether it would be appropriate. We'd be happy to submit a filing to that question if the court's interested. And the reason I'm qualifying is that this is not sufficiently covered by the SCARE case, i.e., that Montana Supreme Court would decide otherwise, and maybe the best way to find that out is to ask them. It's certainly one way to find it out, Judge Burson, but let me emphasize first that if you look at what the district court said in the Ritka case, and then, after all, it just applied the Ritka holding in this case, it's absolutely untenable. The problem is that Ritka said that Brewer, which was a Montana Supreme Court case involving ski areas, expressed skepticism about any change in the relevant standard of care. And, first of all, that's not what the case held, of course. The case there held that an effort by the Montana legislature to install ski area operators of all duties, of any duty, of any liability, was a violation of the inspection clause. Now, the Montana Supreme Court, in the Meach case, lifted a bunch of statutes, including one very like the recreational use statute, after all, that properly altered, in which the Montana legislature properly altered the relevant standard of care. So, it's clear that the district court was wrong that the Montana constitution precludes the legislature from altering the government standard of care. So, I don't think it's necessary to go to a certification court. If this were a close case, it might be warranted. But, here, there's just no basis for the district court. Brewer is not the clearest opinion in the world. Brewer? Yes. To be sure, but there are enough differences between that case and this that it seems to me you cannot say that the district court did it in Ritka, that it compels the conclusion that Montana's legislature violated the state constitution. That's a serious federal complaint. It's not whether it compels. This isn't like an immigration appeal. I mean, the question is, what would the Montana Supreme Court do? Not on some heightened standard of review, but what would they do? No, I agree. But, remember, what they would do is informed, in this case, by, for example, Meach, which said that it was perfectly fine for the legislature to alter the standard of care. I think our choices, we have two choices. We can either predict what we think they would do, it's not whether it compels the judge, but what's our best prediction? Fair enough. We can ask them, what do you want to do? I think that's right. What do you think? The reason I would... It seems to me those are our choices. I think that's a fair assessment, Judge Golden. Let me just say that the reason I was cautious about the certification question is it's been an awfully long time since I looked into the statute. I don't know what the standards are, and I'd like an opportunity to address whether they apply. So, I'll be happy to submit something next week if that's appropriate. If we want parties to address that, we can send an order... That's fine. ...to the parties and let you both address whether that would help. Thank you, Judge Golden. And then I would also say that the Montana snowmobile statute was adopted in 1987 against the background of the recreational use statute, which established willful or wanton misconduct as the appropriate standard of care. And the legislature in 1987 expressly amended the recreational use statute, acknowledging that it otherwise would apply in some circumstances and said that unless a more specific standard applies. So, here they said that the snowmobile statute would apply. When was the ski statute applied? Do you know that? I'm sorry? When was the ski statute passed? I don't recall when it was adopted, Judge Berzon, but remember the recreational use statute would not have applied there because that was for... there was compensation paid to the... Now, is there anything in the record about how the snowmobile statute applies? I gather that in this instance I think there's a minor dispute about whether there was a fee, but basically there doesn't seem to have been a fee. But the snowmobile statute I guess would apply both if there was or wasn't a fee, is that right? That's right, yes. And do we know whether sometimes there is? Whether sometimes there is a fee? Yes. I believe... I don't know if it's a factual matter, but I think that certainly the contemplation of the legislature was this would apply in either circumstance. That's right. And I'd like to reserve the rest of my time if I could to address the cross-field issues. Thank you. That's fine, Mr. Benner, and thank you. All right, we'll hear from Mr. Hufford. If I'm pronouncing that correctly. Good morning. My name is Andrew Hooper and I'm from Missoula, Montana, and represent the Musselman family in this case. Where to begin? I think we'll start with the questions that the Court raised and some brief remarks. First of all, the approximate cause question, really what counsel is asking this Court to do is to surmise what would have happened if the Court had put up a sign. It's clear to me that it's an approximate cause question as opposed to a cause question. In other words, isn't the real question whether what the government did was in any way the cause of the accident? That's not an approximate cause question. It's simply if we knew that these people were such that they were going to go 55 miles an hour, even if it says 35, and that they were going to ignore signs no matter what they said, then what the government did wasn't the cause of the accident. It's not an approximate cause problem. Yeah, that seems to be the argument. Now, Hufford, forgive me, I seem to be a little hard of hearing today. I'm sorry. I'm having trouble hearing the questions. Okay. Yes, I guess I would start with this. The Court did address that. The Court specifically stated, and it's just incorrect to say that there was no specific finding on this, the Court specifically stated on page 97 that placing the sign on the approach to this hill would have changed the riders' expectations and informed them that the approaching hill was far steeper than the usual grade. So the Court did find that, and there was testimony to base that upon. The riders themselves testified that if there had been a sign, I would have slowed down. Mr. Johnson testified that this was under cross-examination. But Johnson wasn't found liable, so. That's correct. What about the two people who were found liable? Calahar. Calahar testified. Lineberger did not show up for trial. Calahar testified, and he was one of the ones that was found liable. He said that if there had been a sign, I would have slowed down. What about the record as to if there is any evidence that a sign affected whether the injured person, Mr. Musselman, would have been walking up the hill, would have gotten off his snowmobile and walked in the path of the others if there had been correct signage? Yeah. First of all, let's put this in the context of what a difficult spot this puts plaintiff's counsel in to be able to surmise what Brian Musselman would have done had there been a sign. He didn't testify. No, Brian Musselman can't speak. He's not capable. But I will say this. The United States wants to argue that the absence of a sign had nothing to do with Brian Musselman getting off his sled. Well, why was he getting off his sled? He wasn't doing it because he wanted to offer hot chocolate to his friends or anything like that. There's no question why he got off, and the court made a specific finding. He said he got off either to warn his fellow riders of the danger or to assist Johnson. So that was a court finding. It's not contested. Did Johnson just keep going? There was something in the record, I suggest, that Johnson kept going and wasn't even there anymore. No, what Johnson did is Johnson went over the hill, landed very hard, was able to maintain control, turned his sled immediately, and really was doing the same thing. Turned around, went up near the highway, and then back toward the accident scene. So Johnson was in the course of recovering, apparently. Nobody knows the exact timing of events, but Johnson was apparently in the course of recovering from this fly-through-the-air when Musselman was struck. So, again, when it comes to the cause, if there had been a sign, there's no reason to believe Brian Musselman had any reason to get off his sled. And the only reason he got off his sled, and the court found, was to warn the other riders. The court found that Mr. Musselman got off his sled to warn the other riders or to help the other guy who had a rougher time. And the court found that the persons on the snowmobiles would have approached the hill differently had they had signage. Correct. Yes, and the other evidence that's in this case, which the court also cited, that absence of a sign was complained of immediately after this accident, on the accident scene itself. And this is what the court found so dubious. This accident, you mean the Panzer accident? No, no, I mean during the Musselman accident. The absence of a sign was immediately complained of by the people at that accident site. And that's why the court was dubious of the investigation that the United States conducted. Because the first thing, and there is a finding to that effect, that people were complaining, why isn't this hill signed? The investigators immediately, almost immediately thereafter, went running to the claims department and worked with the claims department before they ever finished their report. And that was based on the fact that people were complaining about the absence of a sign. So, again, the whole concept that there's no proof that a sign would have made any difference is ludicrous on its face. But the sign you're talking about would have been a hazard sign because these people already ignored the speed. Yes, it would have been a hazard sign, which basically told them you have a hill coming up here, and regardless of what speed, they would have been traveling. But that's what ultimately matters, not the speed sign, because they were only 10 minutes over the speed limit, 10 miles over the speed limit anyway. That's correct, 5 to 10 over, because it was never clear. And which the court made a specific finding was absolutely foreseeable to the government. And that is, in fact, the main reason the government conducted the 1993, not the speed limit, not the 1996 change, but the 1993 warranting process, because they knew people were driving these speeds. There was a straight stretch before the hill, right? There was, indeed. Wasn't that stretch scheduled to be renovated or changed, altered in order to eliminate that? The hill itself was to be altered. The hill before this accident ever occurred, that hill was scheduled to be leveled or to be altered to a more level. And it's still scheduled, but they're waiting for this trial to be over. How about the statutory standard? Does your client have a view on certification? Well, I suppose that's the only way to definitively decide, but contrary to counsel's position, Judge Malloy was absolutely on solid ground when he ruled the way he did. He did this based on Montana law, how the Supreme Court had treated a nearly identical statute. There were two problems, or maybe three. One is it wasn't so nearly identical because it was a complete absolution from liability, which is certainly a much more problematical situation. Secondly, it was in the context of an industry, and in which the only explanation was economic. Here you have lots of free users, I assume, and there may be other explanations, such as people aren't going to allow them to use it if you don't have a slightly heightened standard. And thirdly, there's the very complicated backdrop of the recreational statute. Even if it is true that this one's invalid, what happens next, which Judge Malloy struggled with, and which is certainly something on which the state's views might be a lot more helpful than our guessing. As much as I think both Tom and I don't want to see this court to be certified, I understand that that may be what this court has to do. I do think that Judge Malloy did address the three points that you made, or I should say that the Montana Supreme Court did. One, the decisions in both Brewer and Mead are very clear. The court was not concerned about the fact that we were abolishing all liability. The court was concerned, and both cases make this very clear, that those statutes eliminated the negligence standard. And they set that out, and I've quoted it repeatedly in the brief, where it is clear that that is their concern, that it eliminates the negligence. Now, the fact that the statutes were different, true enough, but that certainly was not the emphasis of the Montana Supreme Court. I think it's likely that we never have to certify, just that we sometimes do. Sometimes when we do, the Supreme Court doesn't take the case. But I think if we're thinking that that is a serious option, we'll probably send an order that would let both sides comment on it So you could address, in your argument, all the other issues, because there are a lot of them. Yes. Okay, then let's... We're going to cross the field issues now. Sure. Unless Judge Berzon or Judge Schwartz are more on certification now. Then, responding to the discretionary function analysis by counsel, really the government's basic position, no matter... Let me just back up just one question relevant to the statutory question. I don't know the Montana statute, but most certification statutes do want to know whether the issue is going to be dispositive. So that requires us knowing whether the gross negligence, what would happen if it were a gross negligence statute that was a standard that was applying. I think we would have to go back to trial. Or at least Judge Malloy would have to issue new findings. Because we went into this trial without objection, frankly, from the United States, knowing that we were dealing with the Montana snowmobile statute and that we were dealing with a negligence statute. And we had pled in our complaint reckless behavior, just in case that was the standard we would be dealing with. But we didn't have to marshal that kind of proof at trial. And so we would have to go back and either retry the case or have... You're not arguing on this record. Well, at least it would have to be up to Judge Malloy to find it on this record. And you're not confident that it would be fair to even do it on this record. Well, I can't say that I wouldn't be confident we could do it. I think the conduct of the government was outrageous in several respects. So we would certainly feel comfortable making that argument. I just wasn't... In Judge Malloy's court, you didn't have, like, a prior summary judgment on the Montana law, right? We did. You had a prior that not that Montana would just apply, but that regular negligence applies. We did have that order. You tried the case on that basis. We did. And that was the law of the case. If that were changed, you probably, both sides would probably have to take another trial, I would think. And that is one of the reasons I included in our brief the fact that the United States didn't object. Now, understandably, Tom said, yes, we did put that into the pretrial order, and I see that it's there, the fact that they were objecting or wanted to reconsider the standard of care. The bottom line is when we made our motion, they conceded it. They conceded the motion. Well, what they conceded was that Judge Malloy had already decided to question what she had in the other case. But they didn't concede that it was right. They just conceded that there was no point in fighting about it now, here and now. I suppose that would be their point. That would be their argument. How long have you guys been working on this case? Oh, God. Tom's been here for the appeal. I can't say how many trips I've made to Michigan and West Yellowstone, et cetera, et cetera. It's been a long time. I agree. Yeah. In talking about the discretionary function analysis, the government's position, every which way they want to do it, is this. Back in 1993, we had a warranting process, and, by God, that's good enough for us. And no matter what happens on this trail since that time, we can hide behind that 1993 warranting process. Well, they're wrong in two respects. Number one, the 1993 warranting process established as a policy that the safe, prudent rider speed for this trail was 35 miles per hour. They did that based on riding the trail, based on the geometry of the trail, the turns, the dips, the climbs, everything else. They determined that 35 miles an hour was the speed which an average prudent rider could safely negotiate the trail. They then set up their warranting system that they would ride the system at 35, and if anything came up, a drop in the trail, a turn, whatever it may be, that forced them to drop their speed to 25, they would then mark that as a hazard. Fine. The court found that. We don't like the system. We fought against it. But the court ruled, said that was their discretion to, number one, choose a warranting system and the manner they did it was also discretionary. We live with that. But then the court, I should say the government, changed everything. They went in in 1996 and slapped a 45-mile-an-hour speed limit on this trail system, which was already, there was already a policy in place that said 35 miles an hour is prudent rider speed. And they did so for no reason other than the park has one, has a 45-mile-an-hour speed limit. And the park that is next door is not even close to the same riding conditions. But ultimately that only hooks up here. I mean, as you said earlier, the individual defendant here would go five to ten miles over the speed limit. So the relevance of the speed limit really is only as it hooks up to the failure to put the sign up. In other words, at 45 miles an hour it was hazardous, even if it wasn't hazardous at 35 miles an hour. Yes, ultimately that's where the analysis goes. And it's like this. They then, the court, once they put that 45-mile-an-hour speed limit in there for no reason, really for no reason other than the park had one, then that led to two things. Number one, it created rider expectancies that they could ride this thing at 45, when in fact that was not the safe speed that the government had already determined was the safe speed for this trail system. So in a discretionary function analysis, they violated their own warranting system. In other words, they failed to properly implement the warranting system as they had already decided upon. So for the government to argue, yeah, but it wasn't a hazard at the 35-mile-an-hour warranting system, that's fine. But it is the government who changed the policy and failed to follow their own policy by enacting the 45-mile-an-hour speed limit. Do you see a question? Yes, I don't. Okay. And so you have that one line of cases of failing to properly implement the policy, and they did. And there was no social basis for doing it. They did it simply because the park had a similar 45-mile-an-hour speed limit, and there was no reason to stop implementing the original warranting system. But secondly, and I think this is what the court was reaching, is you also have the failure to warn cases. And this is simply where they have a known hazard. Now, counsel is arguing they didn't know about the hazard. Well, they did know about the hazard. They knew about this hazard prior to this accident. First of all, it had already been slated for removal. That tells you something. Number two, they had the Panzer accident. Now, the Panzer accident was no minor blip on the radar screen. This was people traveling at 35 to 40 miles per hour at night, returning from Enos, same situation. They approached this trail. They both testified they didn't see it coming, and this is true of all the riders. You just don't see this drop coming. They hit this drop off at 35 to 40 miles an hour, and there is a 12-foot groomer with big car headlights on the top of it and a flashing light at the bottom, and they couldn't see it. They didn't see it until they got there. And Mr. Panzer's seat was actually ripped by the blade of the groomer. We're talking about one foot preventing him from being smashed like a bug. What did the evidence show afterwards when they ran tests about the speed at which one sort of took off from this hill? I'm sorry, what's the question? The speed at which you sort of got airborne when you went down the hill. Well, we can thank the government for that. They immediately, and this tells you something about their reaction to the accident. They knew there was a problem here. They immediately conducted tests of their own professional riders approaching this drop off, and they did a video of it. And at 35 miles per hour, 10 miles below the speed limit, the skis go into the air, which our expert said, you don't have any control when your skis are in the air. At 45 miles per hour, the whole machine flies. You are completely in the air. You are completely out of control. Now, the government argued that, well, see, we did it on a video. Therefore, you can do it safely. It's not hazardous. And, you know, that's crazy. And the court made extensive findings about that and said, yeah, that's fine. If you know it's there and it's broad daylight and you've gone 35, 40, 45, that's a whole different story than people who are from out of state who have never ridden this thing before, and they go flying off at 45 miles per hour. I mean, number one. What was the basis? I guess I'm sort of interested in the causation. I'm not necessarily concerned about the causation. What was the basis for finding the individual defendants then 50% liable? They were drunk. They were going too fast. But if they would have been in the same position, even if they weren't drunk and weren't going too fast, why are they 30% liable? Well, that's the point of our argument. You know, if you want a legal analysis, I'll try to give you that. If you want my personal feelings, I'll give you that. No, I want to make a legal analysis. All right. The finding was simply that they were exceeding the speed limit, and they shouldn't have been, and that they had some amount of alcohol. Now, Leinberger was clearly intoxicated. Nobody could argue against that. It's extremely equivocal about Kalahar. And every other word you're going to hear out of the government's mouth, and we heard it at trial, was drunken speeding, drunken speeding. That was the whole emphasis of the case, and the fact of proof just wasn't there. It was there for Leinberger, but it was not for Mr. Kalahar. But the bottom line is I believe that's what the court ---- I mean, this cuts in both directions. Their negligence has to hook up to the causation, and if it does hook up to the causation, then why did the government run the main file? I don't think, I mean, frankly, and this is our expert, Mr. Kennedy, the human factors expert, this was kind of his position, and it was really with regard to Musselman, so you have to infer with the other writers. His position was even if there was some amount of alcohol, given the reaction time that you can't even see this hill 100 yards away, and if you're traveling 45 miles an hour, I don't care if you're stone-cold sober and riding the speed limit of 45, by the time you know it's a drop, you're over it. That's how fast it happens. So our human factors experts didn't make any difference. But this hill had been there for a very long time, right? Was there any record of other accidents on this hill? Well, there was certainly the Panzer accident. Right. Yes, I mean, that was... There should have been lots of accidents. Well, the problem is 90% of accidents don't go running to the Forest Service to report. People who have accidents, you know, they tumble. You don't often have accidents where people, you know, hit other ones like they did here or hit a groomer. Most of any accidents that would occur are not going to be reported. These are people that land hard and shake the dust off and then move on their way. Not if their machines are completely cracked up, which is what happened to these two guys, I guess. Sure. Aside from hitting them. But again, that doesn't mean they necessarily want to go contact the Forest Service and tell them. We're talking about accidents by the Forest, you know, that are actually accident reports by the Forest Service themselves. The other point is that the government, in the Sutton case, Sutton's a good example of the type of case we're dealing with here, where you have a known hazard, and that's particularly an interesting case, where the Navy actually placed a mooring buoy out in the middle of navigable waters, even though they already had their own system in place for warning the navigable traffic. They put their own buoy out there. Somebody smacks it, and the Navy says, well, we have our own system in place, and under that system, we don't feel we have to warn. Well, this was a known hazard. This was a hazard. It was placed there by the Navy, and the Ninth Circuit made it very clear, no, you have to report that. I mean, you have to sign it. Summers, that whole line of cases say the same thing. In this case, the government had a known hazard. The Panzer accident was absolutely proof that this was a dangerous condition, especially with a new speed limit of 45 miles per hour, because what the government itself stated in Panzer, in the investigation, was the speed limit, the speed of 35 to 40, that's 5 to 10 miles below the speed limit, too fast for this hill, number one. And number two, visibility is zero. You can't see a monstrous machine like a groomer at the bottom of this hill until you are there, and that's confirmed by the government's own independent tests after the fact. So the government had this notice about this hill. They had the notice that 45 is too fast. They had notice that you can't see. They had notice that an individual was nearly killed going over this, one foot to the left and Panzer would have been smashed. And yet, in the face of all that, and then there was the face of everything else they knew about rider expectancies, straight groomed, stretches of trail, nighttime riding, all the things that the court indicated, they had actual knowledge of an actual hazard, and so there's no policy reason for failing to post the sign at that time. It looks like I'm down to about 22 seconds. If you need a couple more minutes, go ahead and take them. Let me ask you about approximate cause. What is your analysis of approximate cause in this case? Well, the proper analysis is, first of all, that this court should defer and apply a clearly erroneous standard to Judge Malloy's findings of approximate cause, and Judge Malloy did find that a sign would have changed the expectancies of these riders. So the fact that there was no sign, here is where approximate cause comes in. What would have changed the expectancy of riders is a general group, not these people, not Callahan and Leinberger. Well, the question is how can we exclude Callahan and Leinberger from the general group analysis, and I don't think that is what the court said. They hadn't been ordinarily attentive to signs and rules. I mean, that's really the ultimate problem. They were already going 10 miles over the speed limit and driving drunk. So why we would expect them to obey anything else is the question. Well, simply because that's what the court found. The court found it, and that's what they testified to. Now, if we want to go back, the other point I would make is the government provided absolutely no, zero testimony to the contrary. So if the argument is, well, there's not enough evidence to satisfy, well, there is evidence. There's evidence there to satisfy that the lack of signing did proximately cause this accident. It is the lack of signing or the lack of removing the hill that caused Musselman to get off his sled in the first place. There's no other explanation for it, and that was the court's finding. Riders testified that when they ride around the country, they expect these kind of hills to be signed, that that's what they expect to happen. Callahar testified that had there been a sign, I would have slowed down. So there is evidence in there to indicate that the lack of signing did cause this accident. It simply prevented these riders from having any chance of knowing this hill was there, and did not give them the opportunity to slow down, which the court said they would have done. I will move past the Montana standard of care, because it sounds like the court is going to deal with that one in its own way, and briefly touch our cross-appeal. I think the briefs by both sides are pretty full. They're pretty complete. I think because there was such a difficult time with the evidence in this case, well, let me put it this way. The first issue was that there was just simply no factual basis to support Judge Malloy's decision that Callahar and Lineberger were acting in concert. Acting in concert means there's some kind of agreement. In that manner, isn't there a Summers v. Tice theory, and isn't this a pretty close fit? Excuse me? Isn't there a Summers v. Tice theory, and isn't this a pretty close fit? We all read in law school. Yeah, except Summers v. Tice is not an acting in concert case. It's a case for- That's right, it's not an acting in concert case, but why doesn't it apply here? Because it was never argued, it was never dealt with. It's a different theory. Frankly, I don't know, it's a tough case. And I don't see that where you have two people out hunting, and two individuals- Well, here's why. You have two individuals out hunting, and the negligent act is to shoot in a direction where they shouldn't be shooting. And someone gets injured as a result. There's no agreement between them. There's no discussion prior to hunting. You know, if something gets up, even if old Joe is in the way, we're going to fire the gun. So here we have these two guys, and they're riding their snowmobiles, and they're both falling down the hill together, and one of them hits this guy. And if they're negligent, why isn't that the theory? It doesn't matter which one, because there's no way to find out. You guys figure it out. Well, I guess the answer is it was not decided on that basis. We don't know. We would have to have new findings on that basis to find whether that is indeed the case. The court did not rule in that direction. Well, he did it, except he said that Summers is actually a common design type case. It's not. So it misapplied Summers. Traditional Summers analysis, I think, if one of the parties had settled, I don't know where it leaves you. But here the theory was they were acting in concert, so that even though one of them had settled, the other one could be liable for the full amount. Well, that is what the court did. Yes, you're correct. You're saying there really wasn't adequate evidence that they were acting in concert? Correct. And was the evidence that they were intoxicated and racing? No, there's evidence that everyone, a group of 20, went to Eno's. There's no evidence that Weinberger even knew Callahart, that they sat together, drank together, did anything. They did independent, negligent acts, is what it comes down to. I thought the judge did infer that they were essentially racing each other. Oh, he made that inference, but there was no basis to do so. So that's ultimately a problem. It's a sufficiency of evidence problem? Correct. I see. On that issue. There is insufficient evidence to support the finding that they were acting in concert. I realize that's a tough burden. But you would agree that if they were, even if they never met each other, never talked to each other, if they left the place together, there were any group of people going together, and if they were racing each other, that would be good enough? If they were racing each other. But there's no indication they were racing each other. What you have is individuals who happened to be on the trail at the same time when the accident occurred, and they're both going over the speed limit, and that's why I listed the five, six, seven cases around the nation that say that's not good enough. That's just pure conjecture that they were actually racing. It's a complicated case. We can rely on the briefs. We are over time by just over six minutes, and I'll feel like we should give Mr. Byron more time to respond. So it's up to you. If you want to spend more time, go ahead. But we'll give that time to Mr. Byron, too. Yeah, I guess the answer is do I have any time to respond after Mr. Byron to our arguments, otherwise I'll make them an hour and forever hold my case. We'll give you a minute or two to respond on your cross-appeal argument if he addresses them. Okay. Thank you, Your Honor. Mr. Byron, the hour is getting late, but... I'll make every effort not to. I appreciate that. A little more time if you need it. Thank you. I'll try to keep it short. Let me start in rebuttal on our principal appeal and address a couple of the things that came up in questioning my colleague. First of all, about causation, the finding that the judge made, I think Judge Schwarzer, you recognized this in your follow-up question, did not acquire these two individuals. It merely went to expectations as a whole of riders out there who were not drunk speeding at night. Ultimately, after combing through this, I find that he ultimately said the following. I'm sorry? I find that he ultimately said the following. I find that the hill was a hazard that the agency failed to identify. The Panzer accident provided the agency with actual notice of the hazard. Its failure to eliminate the hazard, of which it knew or should have known, breached that duty and caused Brian Musselman's damages. Isn't that enough of a finding? I don't think so because the central problem here, as we emphasized under Montana state law, is the foreseeability of the intervening cause. Again, the district court doesn't address that in light of what I think Judge Schwarzer- But that only eliminates my problem, which is whether there was a finding of cause, leaving aside approximate cause. Well, no, I don't think it does because it's not just a question of approximate cause. Well, whether or not it is, I don't think it suffices for the very reason that the intervening cause here of the individual being hit by someone else does raise the need for the additional finding that's absent, that we've emphasized that needs to be here. Let me address- Assume that Musselman went over the hill first, then Johnson followed, and he falls off his leg and appears to be injured, and that Musselman goes over to try to administer first aid. Would you say that that's not within approximate cause? Then Musselman gets hit, giving aid. Would you say that's not within the scope of approximate cause? Well, first of all, let me emphasize that those assumptions go well beyond what the district court found here. I'm just giving you a hypothetical. Of course. And I appreciate that, but I do want to start with that caveat. I can imagine a circumstance in which that could be found to be foreseeable. Of course, there's no evidence that he even fell off, let alone that he was injured. But there is evidence that Musselman got up for the purpose of giving warnings and seeing whether he could help. The district court hypothesized two possible reasons that he might have gotten off his snowmobile. One was to check on Johnson, I think the court said, and the other was to warn the oncoming riders of the hill. Now, of course, as we've already emphasized, those are speculative. No one knows for sure why. I guess there's a related question, which I don't know if the findings address, which is, is it so unforeseeable that somebody should be walking on a trail for any reason that the trail should not be set up such that people can stop if they need to? Well, I think what that would entail would be a guarantee of safety that you could walk onto the trail at any time. Now, remember, the court found that Musselman had safely negotiated this hill. And so he was aware that the hill was there, and presumably aware of the challenges it posed to someone less expert than himself. So I think it begs reality, then, to say that the Forest Service can be held liable because an individual who knows that he just went over a hill then goes and walks into the path where he knows he cannot see the oncoming riders because he just went over that hill himself. It's not as though he was blind to... But that's the problem, that you have a hill where you can't see the oncoming riders. The question is whether or not it is foreseeable that people are going to be walking on paths sometimes, occasionally, and so they shouldn't be set up so that you can't see who's there. That would entail a perfectly flat and straight trail at all times. That's not a reasonable assumption. No, I absolutely disagree with Judge Poisson. That cannot be the rule. Oh, except that's what the government apparently is contemplating. No, I don't think so at all. Structure of the trail so it would be straight, visibility would be adequate. No, Judge Poisson, absolutely not. Let me address that for a moment, although I think it's clearly not an issue. First of all, the district court found correctly that the design of the trail is a protected discretionary function. Why are they saying that? That's indisputable. Let me address this question because the plaintiffs do keep raising it over and over again. There has long been a plan to alter the grade of the hill, not because of a safety concern, but because the sun shines on the top of the hill, the sandy soil underneath causes poor drainage, and it melts the snow, so you can't use this as long into the late season as you otherwise would like to. For that reason, there's been a plan to possibly change the grade at the top of the hill. Now, the other change that has been made already to the design of the trail is to alter the flat, straight approach, and the reason that was done is not because of a concern of safety, but instead to move snowmobile traffic away from the right-of-way of the highway, and that's been done consistently throughout the Gallatin National Forest. That was a system-wide approach, and the way that was done was to move the trail instead into the trees, curving away from the road. That gets the snowmobiles away from the highway traffic. It has the other effect of making it no longer straight and flat, but that wasn't the purpose. So not only is that a protective discretionary function, it's utterly irrelevant to the safety question at issue here, and those questions are addressed in the transcripts. Let me turn back to discretionary function for a moment, because there's been a lot of confusion, I think, in the district court's finding and in my opponent's argument between what's called the design speed at which the warranting ride is performed and the speed limit. No one believes in the real world that the speed limit is a guarantee of safety at all times and all conditions. The district court itself found that, recognized that the Forest Service reasonably expects riders to vary their speeds with conditions, and that the posting of a uniform speed limit in no way alters that. Look, if a state highway is signed with a uniform speed limit... So ultimately, I mean, as we, I think, got ourselves to with the other, with your opponent, the real question is the hazard sign or hill sign, not the speed limit. But the hazard, the notion that people are supposed to adjust to the conditions requires that they know the conditions. Yes. So if they don't know there's a hill coming up, they have no reason to know there's a hill coming up, how are they supposed to adjust to it? Well, first of all, the court said it was reasonable for the Forest Service to rely on drivers taking account of nighttime conditions as well. You slow down at night if you're being prudent, after all. These individuals did not, but the prudent rider does. And there's evidence in the record that demonstrates that the hill is very visible during the daytime. You can see that there are snowstops and there are trees beyond it. These riders were way exceeding the speed limit, after all. They were overdriving their headlights as well. The beams of their headlights didn't illuminate far enough in front of them for them to react in time. Now, the fact that the court held that you couldn't see this hill at night doesn't, isn't consistent with the court's also proper recognition that at night you need to slow down. If these riders had slowed down, they would have seen that their headlights suddenly shone on black instead of on white. That's what's at issue here in the practical terms. Now, translating that into the legal doctrines of discretionary function or gross negligence or causation, we lose sight of that sometimes. And I think it's important to remember that let's translate this into our own real-world, everyday experience. If you're driving on a highway and it's dark or it's foggy or it's raining or snowing, you don't expect the speed limit to be a guarantor of your safety. That's what these plaintiffs are relying on in their continuous references to the speed limit. The design speed of the trail is dictated by the geometry of the trail. There's a discussion of this in the transcript portion that we cite in our brief in the discretionary function section. The geometry refers to the angles, both vertical and horizontal, that the trail traverses. The assessment of that geometry, those angles, told the rangers in 1993 that 35 miles an hour was a reasonable overall approach to how you could travel this trail. You weren't always going to go 35. You'd slow down for some conditions. You could speed up at other times, just as on a highway you would do that. That has nothing to do, whatever, with the speed limit. The reason we know it has nothing to do with it is the district court never believed, and in fact expressly found, that there was no mandatory duty to set a speed limit. There wasn't in 1993. If there was, it would have to have been 35 miles an hour, whereas the Forest Service reasonably had no speed limit at that time. The change to impose a speed limit to allow for enforcement of speed concerns in 1996 in no way dictated any change to the geometry of the trail, nor to the design of the trail. Suppose we just reduce the speed limit. Let's forget it. The fact is that there was at this location a week before an accident where somebody at night didn't see what was going on and nearly had a fatal accident. Is that much accurate? No, I don't think it is because, first of all, it's clear that it was not nearly a fatal accident. The guy wasn't hurt. He didn't even fall. He wasn't, but that's because he didn't hit him straight on. That was sort of fortuitous. Presumably, but we don't know what would have happened in different circumstances. He had somebody who couldn't see. That's right. Somebody lost control of his... We don't know if he lost control, presumably, but we don't know that. What does that tell us then? The question, and in discretionary function analysis terms, I think we have to ask, what was the government obliged to do in response to that? In the two weeks that followed, there's no mandatory duty. So then the question is, what should the government have done, taking account of whatever factors, safety and others, that it should have? Here, remember, it seems to me that the primary concern of the Forest Service at that time would have... It's your contention that the government had made a discretionary decision not to react to known hazards by putting up signs, I mean hazards of which they became aware because of accidents, unless they went through the whole warranting process first. No, absolutely not, Judge Berzon. But remember, the key here is that there's no mandatory duty to post a sign after every accident. So then the question becomes, what would... What is the duty, and what factors does it... Are we talking about duty in a discretionary function sense, or in a negligence under Montana law sense? No, we're not challenging the negligence finding. What we're saying is that under the discretionary function analysis, the Panzer accident is irrelevant, first of all, because it doesn't tell us anything new about the discretionary decisions of the Forest Service. That two-week period was an insufficient amount of time, and you're right that that goes to negligence, but not only to negligence, as I tried to explain in my opening. It goes as well to what the Forest Service could reasonably have been expected to do in that period of time in assessing what that accident told them. And I remember the first concern... ...to be saying that there was a political, social, or economic policy reason that a decision was actually made not to do this, and that was a discretionary decision. In fact, we don't even know that a decision was made not to do it. It could have just been complete negligence. Right, but discretionary function, after all, doesn't look to the subjective intent. It asks whether the policy considerations that could have been looked to... That's what Gobert tells us. That's very clear. And so the question here is, did a decision-maker actually contemplate political, or social, or economic considerations? The question here is, in the process that led the Forest Service not to... Why would somebody get up in the morning and objectively say, I know there was an accident there. In general, we have signs around telling people when there are hills, but I'm not going to put a sign up there, even though there's no reason I couldn't. Here's why. Because that person would say, in the second moment he or she thought of it, I don't know what the cause of that accident was. It might have been the groomer doing something wrong. And this is what I was trying to get to over and over. The principal concern of the Forest Service, following the Panzer accident, would reasonably have been, and presumably was, I don't think there's any evidence of the record here, would reasonably have been, gee, our groomer, or our partner's groomer, was at risk, was the cause of this accident. The first concern wouldn't have been, oh, there's a hill there, although that might have entered into the analysis of that accident as it was investigated. Two weeks is not enough time. Let me ask you about your two-minute point. Suppose instead of the Panzer accident, there had been a sinkhole that suddenly developed in that trail at the foot of the hill, and the Forest Service discovered it. Would you say there was a duty to put up, without regard to discretionary functions, a duty to put up a warning sign? Or would they have to go through channels to figure out whether they're going to do it or not? Well, in that circumstance, I can't think of a policy determination that could be based on anything other than safety. Whereas in the Panzer circumstance, I can, and the one that I just emphasized, which is what was the role of our groomer in the cause of this accident in determining was this really a safety concern that goes to the hill at all? Is that a policy question? I think it is. What was the role of the groomer? Sure. That was your policy question, wasn't it? Yes, because it goes to the recreational, making these trails available for the recreational use of the public. What's the downside of putting up a sign saying hill when there's a hill? Well, if you do it every time there's a hill, Judge Berzon, you get, again, a plethora of signs. And there's evidence here that there were policy reasons that went to the perception of this natural environment as not being interrupted by a whole bunch of signs out there, and also trying to generally minimize the number of signs that the trail users encountered, both because it had an impact on the natural environment and because it made it more likely the signs would be ignored. We're now almost 12 minutes over. Now, you'd also apologize because my colleagues have been engaging you, and we let your colleague, Mr. Hooper, go further earlier. We're 12 minutes past the 20 minutes extended by five minutes, I think. Sure. So if you have anything further to say, save them the next ten seconds. Certainly. One of my colleagues has another question. May I address the process here briefly? And in doing so, I'd like to say first, this empty chair rule that Montana has that's quite unusual doesn't apply here because the only issue is causation, not allocation of liability. The judge found that there was negligence and a breach of duty by both Kalahar and Weinberger. They were both negligent. That's not at issue. There's no allocation that's a problem, and that's what this case is talking about. On the credibility of the experts, the plaintiffs don't challenge the credibility finding that the district court made. That's a clearly erroneous decision, and it's not at issue here. I believe that's all I have, and we urge the court to reverse the judgment of one. Thank you. Thank you, Mr. Bowring. All right. Mr. Rupert. If I may, I'll try to keep the same as the last words. I will be very brief. I'll just start with the last one that's freshest in my mind. Yes, we absolutely found that there's a problem with this case. There's a problem of credibility of the government's expert, life expectancy expert, and that came from the mouth of the expert himself. The expert was a statistician who came in and said, based on my own statistical model, this is how I'm going to apply the to determine a life expectancy for Brian Musselman, age, sex, mobility, need for feeding tube. End of story. Then the expert on cross-examination was asked, well, what about quality of care? What about the quality of medical care? You've taken a bunch of people who are institutionalized in California. These are street people. These are people from all walks of life. What about someone who's receiving the absolute best possible care? Would that make a difference? He said, yes, it would make a difference, but I don't have that information, so I can't give you an opinion on that. So we brought in Brian Musselman's treating physician, who has treated numerous head injury patients, and he came in and said that this guy is getting the best possible care, and based on this, this man, there's no reason he shouldn't have a normal life expectancy. The other point is the government had their own expert, same qualifications as Dr. Bergen. They brought in Dr. Stone, an eminently qualified head injury specialist, who came in and testified simply about the nature of Brian's injuries, and Judge Malloy actually said, wait, don't you want to ask him about life expectancy? And the government said, no, we're not going to do that. So, yes, we think there is a serious problem here, and it has a very dramatic effect on this poor soul's life. He's expected to live 30-some years, and Judge Malloy found that it's only 12.8, and then coupled with the fact that his damages have been reduced by 60%, there's a very severe effect here. And that's not a basis for changing an opinion, changing the order, but certainly the point that there was no substantial basis for this expert's opinion, that certainly is a ground for reversal. Montana is a little quirky, but it is what it is. Our Supreme Court has a whole line of cases that says when you've got a settling defendant, it doesn't just mean that you go in and you talk about the ultimate liability. You can't bring them in, period, as far as assessing their negligence. You cannot take their negligence and make it part of the equation. That's what he did with Kalahar. He took Kalahar's negligence, and he made it part of that finding that Kalahar and Leinberger were jointly and severally liable. It couldn't have happened. You couldn't have that finding unless you considered Kalahar's negligence, and that's what he did. And that may seem like a strange rule, but if you look at the list of Montana cases, starting with the Deere case up through the Kusinberry case, that's clearly what the Montana And the reason there aren't so many cases is because people keep saying, well, you don't really mean this, do you? You don't mean we can't even talk about this. The problem is, if you didn't bring them both in, you'd have a hard problem proving either of them negligent. I'm sorry, the coffee broke. If you didn't bring them both in, you'd have a hard problem proving either of them negligent on the facts of this case. You'd probably lose. You could have lost on the merits had you not brought them both in. Had we? We could have lost. I think the government brought them in, right? Right, but had they not both been there, they could not both have been found. Neither of them might have been found negligent. I think that's what you wanted. That's the point. Had you not brought them both in, and in Montana, the law is clear. A settled defendant is out, and you cannot. It would be no different than if the government had argued to the jury, Kalahar was negligent. Here's what he did. He was feeding, he was drinking. Findings that the court ultimately made, and ultimately said, yes, Kalahar, you're negligent. Weinberger, you're negligent. But I can't tell who hit him, so I'm going to combine your negligence. And that's what the court did. Are you interested in certifying the other issues? Is this an issue? Well, if you're going to certify one, I mean, if you feel that's necessary, that would be another one to certify. If indeed, and it is, Montana law is a little different. There's no question about it. Our Supreme Court has really gone a long ways with this, because they want to encourage people to settle. They want them to settle out and get people out of the case and get it resolved. But it's a string of five cases that right along the line just keep pushing the line even further and further to the point where it says you cannot throw in their negligence into the equation. Anything else on your? No, that's all, Your Honor. Well, we thank Mr. Rupert, and we thank Mr. Byron. If there's nothing further, we will wrestle with the case. Can I just say one thing, which is I really appreciate the arguments. You probably, both of you, do your records on the issue incredibly well, and we really appreciate it. Thank you. Very nicely done. It's been a privilege. And so we will submit Overson v. United States of America. If we call for supplemental briefing, we will vacate the submission and then resubmit it. So that's where it is. Okay, thanks.
judges: Gould, Berzon, Schwarzer